When the act of 1848, for the more effectual protection of the property of married women, took effect, the rights of the respondent, William Gregg, respecting the legacy bequeathed to his wife by the will of her father, were as follows: He was entitled to prosecute for it, and when recovered to take the money to his own use; he had a right to assign it for a valuable consideration, and such assignment would vest it in the assignee, and would cut off the wife's right to it in the event of her surviving him, and he might also release and discharge it. These rights were, however, subject to the jurisdiction of the courts to compel him to make a suitable provision for her, under the head *Page 210 
of what is called the wife's equity. In the event of her dying before him and before he had recovered the legacy, it would belong to him absolutely; and should he afterwards die, leaving the money uncollected, his executor or administrator would be entitled to collect it as a portion of his assets, without taking out administration on her estate. But should he die, leaving her surviving, without having reduced the legacy to possession and without having assigned or released it, or recovered a judgment or decree in his sole name for the money, it would survive to her, and his representatives would have no interest in it. (2 Kent's Com., 135 and seq.; 1 Roper on Husband andWife, 227; Schuyler v. Hoyle, 5 John. C.R., 196; 2 R.S.,
75, § 29; Roosevelt v. Ellithorp, 10 Paige, 415, 420;Lockwood v. Stockholm, 11 id., 87, 91.)
The single question in this cause is, whether these rights of the husband to the legacy in question were taken away by the act of the legislature referred to. When that act was passed he was prosecuting, in the joint names of himself and his wife, to obtain a decree of the surrogate for the payment of the legacy; and but for the statute, it is entirely certain that he would have been entitled to a decree which would have enabled him to recover the money and appropriate it to his own use.
It seems to me to be impossible so to construe the second section of this statute as to limit its provisions to property to be acquired by a wife, then married, after its passage, as was done in Snyder v. Snyder (3 Barb., 621). The section relates to persons in a state of coverture when the act was passed. It speaks of the real and personal property of the wife, and declares that it shall be her sole and separate property. The language is sufficiently broad to embrace the property which she owned at the passage of the act. Still, were it not for the concluding words of the section, we might perhaps apply to the provision the doctrine of Dash v. Van Kleek (7 John., 477), and of the *Page 211 
class of cases which hold that general words in a statute should be construed prospectively, where a different interpretation would take away vested rights. But the act declares that the property of the wife shall be her sole and separate property, as if she were a single female, except so far as the same may beliable for the debts of her husband theretofore contracted. This last expression could not be predicated of property which might be acquired by or be given to the wife after the passage of this act, for all such property would be completely protected by the third section. Neither can the provision be limited to the strictly separate property of women then married, for as to such property there would be no need of such a statute; and besides, it would not, ordinarily, be liable for the debts of the husband. I am, therefore, constrained to believe that the true meaning of the section is, that all property which the wife owned at the time of the marriage, and that all such as she had acquired by gift, devise or otherwise during the coverture but before the passing of the act, should thereafter be deemed to be vested in her as though she were a feme sole, to the exclusion of any title which, by the preëxisting laws, the husband had acquired in it by virtue of the marriage relation, saving only the rights of creditors. We are to inquire, then, whether the legislature were competent to enact such a law.
I am of opinion that the act, in its application to this case, is a violation of the constitution of this state. Among the limitations of the powers of government contained in that instrument is the one which declares that "no person shall be deprived of life, liberty or property, without due process of law." (Const., art. 1, § 6.) That the right which the respondent had to this legacy, the instant before the act of 1848 took effect, was property, in the justest sense of that term, I cannot doubt. An immediate right of action for the recovery of money, which, when recovered, is to belong to the party in whom the right of action *Page 212 
exists, subject to be defeated only by the contingency that a person in being may die before judgment can be obtained, is a valuable pecuniary interest, which deserves protection equally with rights which are absolute and unconditional. Besides, this was an interest which the respondent might sell, and for which he might receive the consideration to his own use. This property the act, if valid, has effectually deprived him of. It declares it shall no longer belong to him, but shall be the property of his wife, as though she were a single female. The act does not fall within the meaning of due process of law. That term, according to Lord Coke, means being brought in to answer, according to the "old law of the land." (2 Inst, 50; and see, also, Taylor v.Porter, 4 Hill, 140, and cases cited by Bronson, J.; 2Kent's Com., 13.)
The provision was designed to protect the citizen against all mere acts of power, whether flowing from the legislative or executive branches of the government. It does not of course, touch the right of the state to appropriate private property to public use upon making due compensation, which is fully recognized in another part of the constitution; but no power in the state can legally confer upon one person or class of persons the property of another person or class, without their consent, whatever motives of policy may exist in favor of such transfer.
I have intentionally forborne to rely upon the principle mentioned in some cases, of a supposed implied restriction upon legislative power, arising out of the nature of free institutions; firstly, because I suppose a judgment in favor of the respondent will stand firmly upon express constitutional provisions, but principally because, as at present advised, I am not prepared to assent to the doctrine that the courts can limit the authority of the legislature by exceptions which are not found in the constitution itself. (2 Kent's Com., 340, andcases cited in note (a) ; Taylor v. Porter sup. Wilkinson
v. Leland, 2 Pet., 657.) *Page 213 
The constitutional validity of the statute in question has been several times under consideration in the supreme court, where views in their result similar to those which I have expressed have generally prevailed. (Snyder v. Snyder, 3 Barb.S.C.R., 621; Holmes v. Holmes, 4 id., 295; White v.White, 5 id., 474; Hurd v. Cass, 9 id., 366.)
The judgment of the supreme court should be affirmed.
All the judges, except RUGGLES, J., who took no part in the decision, concurred
Judgment accordingly. *Page 214 
[EDITORS' NOTE: THIS PAGE IS BLANK.] *Page 215